```
   Washington Place to High Street, the convenience
   store --
       A.     Worcester Place.
       Q.     Worcester place, excuse me.
              -- to High Street, where the
   convenience store was located, how many officers
   transported you? Was it just one?
       A.     Yes.
       Q.     Okay, so it was only one officer?
       A.     Right.
       Q.     When you were transported, you believe
   by a Hispanic officer, back to the station --
       A.     From the scene to the station.
       Q.     -- was anything said? Did he say
   anything to you?
       A.     No.
       Q.     Did you have any conversation with
   him?
       A.     No.
       Q.     Did you tell him that you didn't do
   it?
       A.     Yes.
       Q.     You did.
       A.     Yes.
```

```
1    Hispanic?
2         A.    Yes, sir.
3         Q.    There was no conversation?
4         A.    No.
5         Q.    No threats were made?
6         A.    No.
7         Q.    No racial slurs were thrown about by
8    that officer?
9         A.    No.
10        Q.    And you were brought to the station,
11   and did you go through a booking process?
12        A.    Yes, sir.
13        Q.    And were you in cuffs during that
14   period of time?
15        A.    No.
16        Q.    No?
17        A.    No.
18        Q.    Okay. Do you remember who booked you?
19        A.    I think it was Lieutenant Higgins.
20        Q.    And did he ask you a series of booking
21   questions?
22        A.    Yes, sir.
23        Q.    You're familiar with booking
24   questions?
```

1  A. Yes, sir.

2  Q. And when he was booking you did he
3  threaten you in any way?

4  A. No, sir.

5  Q. He didn't use any racial slurs to you
6  in any way?

7  A. No, sir.

8  Q. It's fair to say you went through the
9  booking process with him in the beginning, you
10 gave him your background information, name, date
11 of birth?

12 A. Yes, sir.

13 Q. What is your date of birth?

14 A. 8/2/68.

15 Q. Your Social Security number?

16 A. 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.

17 Q. You were told what you were being
18 charged with? You understood at that point?

19 A. Yes, sir.

20 Q. You were told armed robbery?

21 A. Yes, sir.

22 Q. Lieutenant Higgins began the booking
23 process?

24 A. Yes, sir.

```
 1    Q.   He went through the booking process
 2  with you?
 3    A.   Yes, sir.
 4    Q.   Informed you of your rights?
 5    A.   Yes, sir.
 6    Q.   And then you went through the booking
 7  process and at some point he left, right?
 8    A.   Yes, sir.
 9    Q.   And when he left did he came back into
10  the room?
11    A.   Yes, sir.
12    Q.   And he started some conversation with
13  you?
14    A.   Yes, sir.
15    Q.   Did he ask you about some Springfield
16  robberies?
17    A.   Yes, sir.
18    Q.   And did he ask you if he should have
19  the Springfield police come up and take a look at
20  you to investigate those robberies?
21    A.   Yeah, something like that, yes.
22    Q.   And he was talking, striking up a
23  conversation with you?
24    A.   Yes.
```

1  muscular male holding up stores in Springfield,
2  and he described you as a muscular individual?
3     A.   Yes, sir.
4     Q.   And then he said to you something
5  about, "You didn't do those holdups, did you?"
6  Right? He tried tricking you, in your opinion,
7  tricking you?
8     Then did you slip up and say, "Yeah, I
9  only did this one," by accident?
10    A.   I didn't say that.
11    Q.   You're sure?
12    A.   Yes.
13    Q.   Through the conversation --
14    A.   I --
15    Q.   Through the conversation -- if I could
16 finish the question, Mr. Ribeiro, please.
17    So through the conversation, when he
18 was saying these things to you you didn't slip up
19 by accident and say something by accident?
20    A.   I know I didn't say it.
21    Q.   You didn't say it at all.
22    A.   No.
23    Q.   You never indicated, "Yeah, I only did
24 this one"?

```
1    Q.    You didn't see those posters?
2    A.    (Shaking head.)
3    Q.    You had been booked before. You
4    understood your rights, correct?
5    A.    Yes, sir.
6    Q.    So other than that there was no other
7    indication of any conflicts with Lieutenant
8    Higgins? No arguments, yelling back and forth, so
9    forth?
10   A.    No, sir.
           (Short recess.)
12   Q.    We just indicated you were just
13   offered some medication?
14   A.    Yes, sir.
15   Q.    Do you need that medication?
16   A.    I can take them later.
17   Q.    It won't affect your mental clarity?
18   A.    No.
19   Q.    It won't affect your ability to
20   understand questions or to answer questions?
21   A.    No.
22   Q.    Or to concentrate or to focus?
23   A.    No.
24   Q.    At any point, also, if you need a
```

1  break, Mr. Ribeiro, please indicate so and we'll
2  take a break.
3     A.   Mm-hmm.
4     Q.   So you were in the booking area. How
5  long were you in the booking area? You said about
6  ten minutes?
7     A.   Something like that.
8     Q.   It's fair to say Lieutenant Higgins
9  wasn't in there the entire time with you? He had
10 left.
11    A.   Yeah, he left.
12    Q.   And you were indicating while you were
13 in that booking room that they had the wrong
14 person, that you didn't do anything?
15    A.   Yes, sir.
16    Q.   Were you sweating at that point? You
17 kept walking around the booking room?
18    A.   Yes, sir.
19    Q.   Okay. Upon completion of the booking
20 you were informed of the charges?
21    A.   Yes, sir.
22    Q.   You understand it was armed robbery
23 while masked, possession of a firearm without a
24 license to carry?

1   A.   Yes, sir.
2   Q.   Possession of ammunition without
3   permit?
4   A.   Yes, sir.
5   Q.   If you know, did that armed robbery
6   charge ever become a subsequent offense? Were you
7   ever charged with a subsequent offense, or a
8   violent history?
9   A.   I had a drug charge in 2002.
10  Q.   Were you ever indicted as a violent
11  felon?
12  A.   No, sir.
13  Q.   Do you remember any of the officers
14  reading you your Miranda rights?
15  A.   No.
16  Q.   At any point, you don't remember, at
17  the scene?
18  A.   No, they didn't.
19  Q.   No one did?
20  A.   No.
21  Q.   Is it possible you didn't hear them?
22  A.   No.
23  Q.   You just didn't pay attention?
24  A.   They never read them to me.

that I didn't do it.

Q. That's the only statement you made.

A. (Nodding.)

Q. So when you say you weren't allowed to use a telephone, you didn't make any incriminating statements after that.

A. No.

Q. Okay. How long were you held at the police station prior to being transported over to court?

A. About an hour or two.

Q. You weren't in the police station very long.

A. No.

Q. Okay. So they went through the booking process and then brought you over to the Hampden court?

A. Yes, sir.

Q. You were held on bail?

A. Yes, sir.

Q. Do you recall how much bail you were held on?

A. Fifty thousand, I think.

Q. You have been held ever since?

```
 1        A.    Yes, sir.
 2        Q.    Okay. And you said you had a motion to
 3   suppress hearing on this case?
 4        A.    Yes, sir.
 5        Q.    What was the result of that motion to
 6   suppress hearing?
 7        A.    I was denied by Judge Curly.
 8        Q.    By Judge Curly?
 9        A.    Yes.
10        Q.    What was the nature of the motion to
11   suppress?
12        A.    It was a motion to suppress because it
13   was illegally obtained and fabricated. The police
14   said that I admitted to the crime. They have no
15   recording, no video, no electronic video of the
16   alleged statement. According to the Supreme
17   Judicial Court it's supposed to be electronically
18   recorded. According to the Supreme Judicial
19   Court, interrogations by police should be
20   electronically recorded.
21        Q.    You said interrogations?
22        A.    Yeah. And I never signed a statement
23   against myself. They had no statements saying
24   that I admitted to it.
```

```
 1    the victim, no Miranda warning, never signed a
 2    Miranda warning card as indicated on the police
 3    report. False arrest and prosecutorial
 4    misconduct.
 5         Q.    When you made some police misconduct
 6    allegations you indicated threats?
 7         A.    Yes.
 8         Q.    Racial slurs.
 9         A.    Yes.
10         Q.    I think we clarified that the only one
11    you allege had said that was Officer Donze?
12         A.    Yes.
13         Q.    Not Officer Kelly and not Lieutenant
14    Higgins.
15         A.    No.
16         Q.    Can you tell me what police misconduct
17    is alleged about Officer Paul Kelly?
18         A.    Just not following police procedure
19    with Miranda and photo arrays and line-up. That
20    should have been conducted in the case.
21         Q.    Do you know if he was the officer
22    responsible for conducting the line-up?
23         A.    I'm not sure.
24         Q.    Anything else that you allege was
```

1   misconduct by Officer Paul Kelly?
2       A.    No. Just the fact that he was one of
3   the arresting officers.
4       Q.    So just the fact that he was present
5   at the scene?
6       A.    Yes, sir.
7       Q.    The only allegation is that he was
8   there?
9       A.    Yes.
10      Q.    So as far as you know, you didn't see
11  him do anything wrong?
12      A.    No.
13      Q.    And he didn't say anything to you in a
14  threatening manner?
15      A.    No.
16      Q.    Or vulgarity?
17      A.    No.
18      Q.    Just being present is the allegation
19  against --
20      A.    Yes, sir.
21      Q.    Okay. You don't allege he struck you
22  in any way?
23      A.    No.
24      Q.    You're not alleging any officer struck

```
 1   you.
 2       A.    No.
 3       Q.    No excessive force used, correct?
 4       A.    No striking, no.
 5       Q.    No striking.
 6       A.    Excessive force, trying to force me to
 7   put on a --
 8       Q.    Again, that's Officer Donze that
 9   you're alleging that.
10       A.    Right.
11       Q.    But by Officer Kelly --
12       A.    No.
13       Q.    Never struck you, never swore at you?
14       A.    No.
15       Q.    As you recall, never even spoke to
16   Officer Kelly?
17       A.    No, I never said nothing to him.
18       Q.    Lieutenant Higgins, same thing? Never
19   swore at you, struck you in any way?
20       A.    No.
21       Q.    Racial slurs against you?
22       A.    No.
23       Q.    What's your allegation of police
24   misconduct by Lieutenant Higgins?
```

1  evidence.
2    Q.   When you say Lieutenant Higgins said
3  you signed the Miranda card are you sure it was
4  Lieutenant Higgins that indicated that?
5    A.   One of them -- there's, like, two --
6  two indications that say in the report that I was
7  read my rights and I signed the Miranda warning
8  card.
9    Q.   But you don't know if that's what
10 Lieutenant Higgins said.
11   A.   I know he said he read me my rights.
12   Q.   Right. You claim that's one of his
13 misconducts, that he never read you your Miranda
14 rights.
15   A.   Right.
16   Q.   You had a motion to suppress on that,
17 correct?
18   A.   Yes.
19   Q.   That was the issue of the motion to
20 suppress hearing in the Hampden Superior Court?
21   A.   Yes.
22   Q.   That was in front of Judge Curly?
23   A.   Curly, yes.
24   Q.   That motion was denied?

1    A.    Yes, sir.
2    Q.    Do you know if that's been appealed up
3    to the appeals court or Supreme Judicial Court?
4    A.    No. I had a choice to do an
5    interlocutory appeal, but it would have delayed
6    my trial, and I didn't want no more delays.
7    Q.    So you haven't exhausted all of your
8    remedies, then, in regard to those type of
9    motions?
10   A.    Yes.
11   Q.    You still have other state remedies as
12   a result of him denying your motion?
13   A.    Yes.
14   Q.    That's all at this point you can
15   remember of Lieutenant Higgins', Michael
16   Higgins', misconduct? Not reading your Miranda
17   and indicating a statement attributed to you
18   that, "I only did this one"?
19   A.    Right.
20   Q.    Your memory is exhausted as to that
21   aspect of it?
22   A.    Yes.
23   Q.    I just want to go over some facts of
24   July 12.

```
1        Q.      At that point you knew what they were
2   accusing you of.
3        A.      Yes, sir.
4        Q.      They had told you why, correct?
5        A.      Yes, sir.
6        Q.      Okay. So you did know at that point
7   what they were accusing you of.
8        A.      Right.
9        Q.      So why were you terrified?
10       A.      I didn't know what was going to
11  happen.
12       Q.      You didn't know what was going to
13  happen? What do you mean, you didn't know what
14  was going to happen?
15       A.      I mean what the police was going to
16  do, because Donze was so mad at me, because I
17  didn't cooperate with him, put on a mask, he was
18  cursing at me, forcibly trying to put that mask
19  on me, so I didn't know what they were capable of
20  doing to me at that time.
21       Q.      You say "they". You mean Officer
22  Donze?
23       A.      Yes.
24       Q.      Because no one else said anything to
```

```
 1   use a telephone, because you asked for it,
 2   correct?
 3        A.   Yes.
 4        Q.   And you weren't at the station that
 5   long. You were booked and then pretty quickly
 6   after brought over to the court?
 7        A.   An hour, two hours, yeah.
 8        Q.   I thought we talked, it was an hour
 9   before?
10        A.   Something like that.
11        Q.   Like an hour?
12        A.   Yeah.
13        Q.   So the booking process, processing
14   you -- were you fingerprinted?
15        A.   Yes, sir.
16        Q.   Photo taken?
17        A.   Yes, sir.
18        Q.   Went through your booking rights,
19   correct?
20        A.   Yes, sir.
21        Q.   All the information?
22        A.   (Nodding.)
23        Q.   Inventory of your personal belongings?
24        A.   Yes, sir.
```

```
1    conversation is all correct and true.
2         A.    Yes.
3         Q.    And when you indicate that you said
4    you didn't do anything, robbery, that's also
5    true.
6         A.    Right.
7         Q.    So it's just that one brief sentence
8    we're talking about.
9         A.    Yes.
10        Q.    And it's fair to say, as far as
11   Officer Kelly, again, is concerned, Officer Paul
12   Kelly, he really had nothing to do with this case
13   other than being present at the scene?
14        A.    Yes.
15        Q.    Okay. There's no misconduct alleged by
16   him as far as that's concerned.
17        A.    Not personally.
18        Q.    Not personally, correct?
19        A.    Yes.
20        MR. VIGLIOTTI: At this point I will
21   suspend the deposition to try to get some of
22   those documents that we talked about -- I know
23   you're incarcerated -- regarding the work case
24   and so forth. So at this point we'll suspend and
```