# EXHIBIT B

```
 1              COMMONWEALTH OF MASSACHUSETTS

 2

 3
     HAMPDEN, ss.                        GRAND JURY
 4

 5
     COMMONWEALTH OF MASSACHUSETTS
 6

 7
                     VS
 8

 9
     DAVID RIBEIRO
10

11

12

13
              HEARING HELD BEFORE THE HAMPDEN COUNTY
14   GRAND JURY ON JULY 27, 2004.

15

16

17   APPEARANCES:

18   CATHERINE HIGGINS, ESQ., Assistant District Attorney.

19              LINDA CLAIN, GRAND JURY REPORTER
                HAMPDEN COUNTY DISTRICT ATTORNEY'S OFFICE
20              50 STATE STREET, SPRINGFIELD, MA 01103
                (413) 452-1121
21

22

23
```

EXHIBIT 2
Mc CARTHY REPORTING SERVICE

```
1                          I N D E X

2    WITNESS                                              PAGE

3    Officer Martin Narey                                 3

4                        * * * * *

5                        E X H I B I T S

6    EXHIBIT                                              PAGE

7    1            Prior conviction                        16

8                        * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
1              The witness, Officer Martin Narey, having
2   been first duly sworn, testifies as follows:
3              DIRECT EXAMINATION BY MS. HIGGINS
4       Q.   Would you, please, state your name and spell
5   your last name?
6       A.   Yes, it's Martin, N-A-R-E-Y, Narey.
7       Q.   Sir, are you employed?
8       A.   Yes, I am for the Holyoke Police Department.
9       Q.   How long have you been with Holyoke Police?
10      A.   About fifteen and a half years.
11      Q.   Are you assigned to a particular shift or
12  Division there?
13      A.   Yes, the dog watch, the midnight to eight
14  shift.
15      Q.   Is that the Uniform Division, sir?
16      A.   Yes, ma'am.
17      Q.   Now, sir, were you involved in the
18  investigation and the subsequent arrest of David Ribeiro
19  on the 12th of July, 2004 in Holyoke?
20      A.   Yes, ma'am.
21      Q.   Did you prepare a report, sir?
22      A.   Yes, ma'am.
23      Q.   Would you read that, please, for the
```

1    Grand Jurors?

2         A.    Yes, ma'am.

3              On July 12th, 2004, at 618 hours, while in
4    Car 351, myself, I was heading eastbound on Cabot Street
5    approaching High Street, I observed a muscular dark
6    skinned male with a red bandanna on top of his head,
7    wearing a dark blue and white jacket, run diagonally
8    across Cabot Street and down Cabot Street toward
9    Commercial Street from the sidewalk in front of Sam's
10   convenience store.  The dark skinned male then ran into
11   an alley from Cabot Street between Commercial and High
12   Street towards Worcester Place.

13             As I was driving over Commercial Street I
14   heard a transmission from our dispatcher at 0619 hours
15   that an Armed Robbery had just occurred at Sam's
16   convenience store and the suspect had a red mask armed
17   with a handgun.

18             When I turned the corner from Commercial
19   Street onto Worcester Place I observed the same dark
20   skinned male with the blue and white jacket and the red
21   bandanna on his head come from the same alley onto
22   Worcester Place that I saw him run to from Cabot Street.
23   When he saw me, he ran across the street and hid behind

1 a parked car in front of 21 Worcester Place. I then
2 radioed to all Units to go to Worcester Place. When he
3 saw me approaching with my cruiser he ran into
4 21 Worcester Place and left the front door open. These
5 are townhouses, which are side-by-side with only one
6 front entrance and one stairway for each. I radioed
7 that he ran into 23 Worcester Place -- but the address
8 was 21 Worcester Place. I stated that address by
9 accident because they're all side-by-side. Car 361,
10 Officer Usher, then arrived and I pointed to Officer
11 Usher that the male ran into the open door at
12 21 Worcester Place. We then proceeded into the
13 stairway, when we arrived on the second floor landing we
14 looked up to the third floor landing and observed a male
15 trying to hide in the corner of the third floor landing.
16 I drew my service weapon and covered Officer Usher, who
17 then proceeded up the stairs yelling to the male to show
18 us his hands and this subject complied. Officer Usher
19 then placed the handcuffs on this male and escorted him
20 down the stairs passed me. This was the same person I
21 saw run from the store and into the alley. This was
22 also the same person who was behind the car and run into
23 the open door at 21 Worcester Place. But at this point

1  he did not have the jacket on. Officer Morales, Officer
2  Briant, and Officer Kelley were also behind me at this
3  point. The male went with Officer Briant and Officer
4  Briant read his Rights while escorting him outside and
5  put him in Officer Morales' cruiser, which is number
6  321. I stayed a few minutes on the second floor
7  landing, then left the building and went outside and
8  stayed with Officer Briant, while Officers Morales and
9  Usher were still in the stairway at 21 Worcester Place.
10 Officer Usher and Officer Morales transported the
11 suspect to Sam's convenience store for I.D. The Clerk,
12 Syed Masood, positively I.Ded the male in the back seat
13 of 321 -- cruiser number 321 through the back window of
14 the cruiser. He was then transported to the Station in
15 Car 321 and was Booked and read his Rights by Lieutenant
16 Higgins.
17     Q.  And, who was the suspect, sir?
18     A.  It was David Ribeiro.
19     Q.  All right, please continue.
20     A.  I stayed at Sam's and spoke to the Clerk to
21 get the facts as to what happened, the Clerk identified
22 himself to me as Syed Masood j Syed stated that while he
23 was behind the counter counting the evening receipts he

1  was looking down and counting the money. He heard the
2  front door open and observed a dark skinned, muscular
3  male, with a dark blue or black jacket, with a red
4  bandanna covering his entire face except his eyes, run
5  over to the left side of the counter and enter the door
6  that leads to the back of the counter where the Clerk
7  was standing counting the money. He stated that the
8  muscular male then pointed a silver handgun at him and
9  told him to open the register. The suspect stated that
10 if he didn't open the register he would shoot him. The
11 Clerk opened the register and the suspect then grabbed
12 all the bills and left the change in the register. The
13 suspect then grabbed all the loose money and held it in
14 his hand and pointed the gun at the Clerk and told him
15 to go into the storage room and if he did not go in the
16 -- in the suspect he was going to shoot him. The
17 suspect was going to shoot the Clerk. The Clerk went
18 into the storage room and as he did this the suspect ran
19 out the front door. The Clerk said he went right to the
20 telephone and dialed 911. When he dialed 911 he saw my
21 cruiser drive by on Cabot Street approaching High
22 Street. He hung up the telephone and ran out of the
23 Store to get my attention. When he realized he did not

Case 3:04-cv-30201-MAP    Document 38-4    Filed 09/30/2005    Page 9 of 19

8

```
 1   get my attention he ran back in the Store and our
 2   Dispatcher (Burns) had called him.  He told our
 3   Dispatcher he was robbed at gunpoint and gave the
 4   description to our Dispatcher.  Our Dispatcher then gave
 5   out to all the cars that Sam's was just robbed.  The
 6   Clerk stated that he was unsure how much money at the
 7   time was taken, since he was just counting the receipts
 8   when the robbery occurred.
 9              Officer Usher tagged all evidence found and
10   placed the evidence into the Evidence Room.
11        Q.   And, Mr. Syed works at Sam's food store, is
12   that correct, sir?
13        A.   Yes, ma'am, he's the Clerk.
14        Q.   And, that's where the robbery occurred.
15        A.   Yes, ma'am.
16        Q.   All right, now, sir, do you also have with
17   you a report filed by Officer David Usher, one of the
18   individuals you mentioned who came on the scene?
19        A.   Yes, ma'am.
20        Q.   Would you read his report, please?
21        A.   This is Officer Usher's report.
22             On July 12th, at approximately 0619 hours,
23   while assigned to Car 361, we responded to Sam's food
```

1   store, 515 High Street, for a 911 hang up.  Dispatch
2   informed us that they called the Store back and the
3   Clerk stated he was just robbed.  A description was
4   given out of a red masked man with a gun.
5              Officer Narey, Car 311, stated that he was
6   -- stated that the suspect was running down towards
7   Worcester Place.  We then made our way to the front of
8   17-19-21-23 Worcester Place where Officer Narey stated
9   he ran into the doorway of this address.  Officer Narey
10  pointed to 21 Worcester Place.  A Code 1 was called,
11  which means radio silence, and Officer Narey and myself
12  entered the doorway, which had no first floor
13  apartments.  We withdrew our service weapons for safety
14  and started our way up the stairs.  Other Officers were
15  surrounding the building.  We made our way to the
16  stairway of the second floor landing and looked up to
17  the third floor landing and saw a male wearing a red
18  shirt and was trying to hide to the left side of the
19  stairway.  We then ordered the male to show us his hands
20  and ordered him out into the open.
21             The male then walked out into the open with
22  his hands out and he was ordered not to move.  He
23  started to walk down the stairs and I (Usher) holstered

1  my weapon and went up to meet him and handcuffed this
2  male.
3       This male, later known as David Ribeiro, was
4  then given over to Officer Morales and Officer Briant.
5       Myself and Officer Morales then went to the
6  top floor landing (third floor) and looked to the area
7  where Mr. Ribeiro was hiding.  In that area we noticed
8  trash and a bike in the corner with a blue jacket
9  hanging over that area.
10      I then looked under the jacket and noticed a
11 large amount of money thrown about.  We then noticed a
12 red bandanna on the ground and a chrome colored handgun
13 was wrapped inside the bandanna.  The evidence was taken
14 into custody by me (Usher) and later placed into
15 evidence.
16      Outside, Mr. Ribeiro, was transported to
17 Sam's food store by Car number 321, Officer Morales,
18 where he was positively I.Ded as the suspect who robbed
19 the Store by the victim, Syed Masood.  The victim stated
20 that he had a blue jacket on, and Officer Morales showed
21 him the jacket that we found on the third floor, and he
22 positively I.Ded that as the jacket he was wearing.  I
23 then showed the victim, Syed Masood, the handgun, and

1  the bandanna, and he positively I.Ded them as the gun
2  and the red mask used by the suspect.
3         He was then transported to the Station where
4  he was Booked and advised of his Rights by Lieutenant
5  Higgins.
6         At the Station evidence was tagged and
7  placed into evidence by Officer Usher.
8         Evidence was as follows: One Smith & Wesson
9  .38 handgun loaded at time of recovery.
10        Six bullets, taken out of the gun at
11 Station.
12        $309 U.S. dollars, 104 one dollar bills, 25
13 five dollar bills, 8 ten dollar bills.
14        One red with white bandanna.
15        One red doo-rag found by Officer Briant.
16        One Miranda card signed by the suspect.
17        One blue windbreaker jacket.
18    Q.  All right. And, sir, would it be fair to
19 say that in Officer Usher's report he did mention that a
20 Smith & Wesson .38 Special handgun was recovered and
21 that six bullets were taken out of the loaded handgun,
22 would that be accurate, sir?
23    A.  Yes, ma'am, that's what he has.

1    Q.   All right. And, this Smith & Wesson Special
2 he mentioned was a chrome colored handgun, would that be
3 accurate?
4    A.   Yes, ma'am.
5    Q.   Did Mr. Syed identify it as the handgun used
6 in the robbery?
7    A.   Yes, ma'am, he did.
8    Q.   All right. Now, sir, do you also have with
9 you a report by Officer James Briant, another of the
10 Officers who came on the scene?
11    A.   Yes, ma'am, I do.
12    Q.   Would you read that, please, for the
13 Grand Jurors?
14    A.   On 7/12/04, at 0619 hours, while working as
15 Unit 701, it's outside Hazen Paper detail, I heard a 911
16 call for an Armed Robbery call that just occurred at
17 Sam's store at the corner of High and Cabot Street. The
18 caller stated that the suspect was armed with a handgun
19 wearing a red mask and fled on foot.
20          I then heard Officer Narey state on the
21 radio and stated that the suspect fled in the hallway of
22 23 Worcester Place. This Officer responded as I have
23 specialized training as Emergency Response Team Officer.

1   I entered where the suspect was at 21 Worcester Place
2   second floor landing, where the suspect was being
3   detained by Officer Morales.  Officers Usher and Narey
4   were already on the scene and began searching for the
5   weapon. (See Officer's reports for more information) I
6   took custody of Mr. Ribeiro and read him his Miranda
7   Rights, whereafter other Officers found the money and
8   the handgun.  The suspect was going to be brought over
9   for a positive identification by the Store Clerk.  Just
10  prior to transport I did a pat frisk of Mr. Ribeiro,
11  which I felt a bulge in his left front pocket.  I pulled
12  out a red doo-rag, which was later identified as the red
13  mask the suspect was wearing at the time of the robbery.
14  The red doo-rag was turned over to Officer David Usher
15  where it was properly tagged and placed into evidence.
16       Q.   All right.  And, when Mr. Ribeiro was
17  brought to the Station was he Booked by Lieutenant
18  Michael Higgins?
19       A.   Yes, he was.
20       Q.   Did Lieutenant Higgins write a report
21  concerning that Booking procedure?
22       A.   Yes, ma'am, he did.
23       Q.   Please, read that for the Grand Jurors.

1       A.   This is a report by Lieutenant Michael
2  Higgins.
3           While in the Station as Commanding Officer I
4  went to Booking area and observed a subject there under
5  arrest for an Armed Robbery from High Street that just
6  occurred.
7           Upon arrival I found a male subject,
8  Mr. David Ribeiro, standing before the Booking desk and
9  he was saying we had the wrong person and that he did
10 nothing wrong.  I took notice that this party was
11 sweating heavily and was unable to stand still and kept
12 walking around the Booking area.
13          Mr. Ribeiro was given his Miranda Rights
14 and was asked questions to complete Booking reports,
15 which included his home address.
16          He was again given his Miranda Rights and
17 told of the Right to use a phone to assist himself with
18 bail.
19          Knowing that Springfield and area Police
20 Departments were investigating Armed Robbery complaints
21 the last few weeks, and Mr. Ribeiro stated that he lived
22 in Springfield, I went out to take further look at
23 Mr. Ribeiro's physical description.

1          When I re-entered the Booking area I found
2    that Mr. Ribeiro was sitting on floor waiting to be
3    printed. He was still saying that he did nothing wrong
4    and that we got the wrong guy and continued to say the
5    same thing over and over. I asked him if he had told me
6    he lived in Springfield. And he told me, yes. I said
7    you're not the guy who's not been holding up places in
8    Springfield, are you? He asked me what I meant by that?
9    I told him that Springfield Police were looking for a
10   muscular male who was holding up stores and asked if he
11   did those holdups? Mr. Ribeiro stated he didn't do any
12   of those holdups and said to have Springfield Police
13   come and look at him. I then said to him, you didn't do
14   those holdups, you only did this one? Mr. Ribeiro then
15   said, Yeah, I only did this one. When I pointed out his
16   admission to the Armed Robbery he quickly changed his
17   story and said he didn't rob anything.
18          Q.   Now, sir, do you have Mr. Ribeiro's date of
19   birth and Social Security number?
20          A.   Yes, ma'am, date of birth is August second,
21   1968 and his Social Security number is 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.
22          Q.   And, are you aware of whether David Ribeiro
23   with a date of birth of August second, 1968, has been

1  convicted in the past of one violent crime or one
2  serious drug offense as defined under Chapter 269,
3  Section 10G(e)?
4      A.  Yes, ma'am.
5      Q.  Now, do you have with you, sir, a certified
6  copy of the Holyoke District Court case 02-17CR003629?
7      A.  Yes, ma'am.
8      Q.  Does that show that on the 13th of November,
9  2002, David Ribeiro was convicted of Possession of a
10 Class B Substance with the Intent to Distribute?
11     A.  Yes, ma'am.
12     Q.  Did that incident happen in Holyoke on the
13 16th of September, of 2002?
14     A.  Yes, ma'am.
15     Q.  And, did Mr. Ribeiro have counsel, sir?
16     A.  Yes, ma'am.
17         MS. HIGGINS:  Thank you.  I'd like to
18 have that prior conviction of David Ribeiro marked as
19 Grand Jury 1, please.
20         (Grand Jury Exhibit 1: Marked)
21         MS. HIGGINS:  And, do any of the
22 Grand Jurors have questions?
23         May the witness be excused?

1       Thank you, sir, you're excused sir.

2                    * * * * *

3       (Officer Martin Narey resumes the witness stand)

4       DIRECT EXAMINATION BY MS. HIGGINS (continues)

5       Q.    Let me remind you, you're still under
6  oath.  There is a Grand Juror with a question.

7              THE FOREPERSON:  I have a question.
8  We're doing the charge of Unlawful Possession and I
9  don't remember hearing whether he had a License to Carry
10 the gun.  Just --

11             THE WITNESS:  We weren't aware of him
12 having a License to Carry.  He didn't have it on him.

13             MS. HIGGINS:  Anyone else have any
14 questions?

15             GRAND JUROR:  The same for ammunition?

16             THE FOREPERSON:  He had no possession --
17 no license.

18             THE WITNESS:  No license on that.

19             MS. HIGGINS:  Anyone else?

20       May the witness be excused?

21       Thank you.

22                   * * * * *

23       (Conclusion of the Grand Jury minutes.)

```
 1   COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF HAMPDEN
 2

 3

 4          I, LINDA CLAIN, do hereby certify that the
     foregoing is a true and accurate copy of my stenographic
 5   notes to the best of my knowledge and ability.

 6
                              [signature]
 7                       Linda Clain
                         Grand Jury Reporter
 8                       * * * * *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```