PLAINTIFFS EXHIBIT#3

# REARDON, JOYCE & AKERSON, P.C.

ATTORNEYS AT LAW
(PROFESSIONAL CORPORATION)
FAX: (508) 754-7220

WARD P. REARDON (Retired)
JSTIN M. JOYCE
MICHAEL J. AKERSON
JOHN K. VIGLIOTTI
ANDREW J. GAMBACCINI

397 GROVE STREET
WORCESTER, MASSACHUSETTS
01605
(508) 754-7285

April 22, 2005

David Ribeiro 128571
Hampden County Jail & House of Correction
629 Randall Road
Ludlow, MA 01056

  RE: Ribeiro v. Usher, et al
    C.A. No.: 04-30201-MAP

Dear Mr. Ribeiro:

  Enclosed for your review and signature is a copy of your deposition transcript. As we discussed at your April 19, 2005 deposition you must read the deposition, sign it and date it on the page provided (numbered 165). Additionally, should there be any changes you should use the enclosed errata sheet to indicate the page, line, change and the reason for the change. The purpose of the errata sheet is to make corrections to your deposition transcript not for further testimony.

  Please be advised the signature page and errata sheet must be returned by May 20, 2005 to my office at the above-mentioned address.

  Should you have any questions please do not hesitate to contact me.

              Very truly yours,

              John K. Vigliotti

Enclosure

```
 1    use a telephone, because you asked for it,
 2    correct?
 3         A.    Yes.
 4         Q.    And you weren't at the station that
 5    long. You were booked and then pretty quickly
 6    after brought over to the court?
 7         A.    An hour, two hours, yeah.
 8         Q.    I thought we talked, it was an hour
 9    before?
10         A.    Something like that.
11         Q.    Like an hour?
12         A.    Yeah.
13         Q.    So the booking process, processing
14    you -- were you fingerprinted?
15         A.    Yes, sir.
16         Q.    Photo taken?
17         A.    Yes, sir.
18         Q.    Went through your booking rights,
19    correct?
20         A.    Yes, sir.
21         Q.    All the information?
22         A.    (Nodding.)
23         Q.    Inventory of your personal belongings?
24         A.    Yes, sir.
```

```
 1                      ERRATA SHEET
 2       I WISH TO MAKE THE FOLLOWING CHANGES IN THE
 3  FOREGOING TRANSCRIPT OF MY DEPOSITION:
 4
 5   PAGE      LINE      CHANGE            REASON
 6   144       8         two hours         stenographical error
 7   144       18        No rights         word manipulation
                         were given        by atty. John Vigliotti
 8                                         and stenographical error
 9  on line 8 Attorney John Vigliotti (defendant) attempted to manipulate
10  words by insisting that plaintiff was in police station for an hour.
11  It was well above two hours.
12  on line 18 Attorney John Vigliotti again used word manipulation
13  to say that plaintiff was read his booking rights.
14  There are no such thing as booking rights.
15  If he is refering to miranda rights, the answer is NO!
16
17
18
19
20
21  DATE: 5-6-05              [signature] David Ribeiro
                              DAVID RIBEIRO
22  mg
23
24
```

11) In exhibit#3 on line 18 of page 144 atty.John Vigliotti in his questioning of plaintiff(at said hearing) twisted and manipulated words by attempting to confuse the plaintiff by stating in deposition"YOU WENT THROUGH YOUR BOOKING RIGHTS CORRECT?" As you can see from plaintiffs exhibit#3 that atty. VIgliotti changed miranda rights to booking rights in a desperate attempt to use trickery and coercion as just what this very civil matter is speaking of.

12) Also line 7&8 atty.Vigliotti attempted to manipulate words again and twist the plaintiffs affirmation as to the amount of time the plaintiff spent in police station without being allowed to use telephone,even after the plaintiff requested to do so.

13) In the plaintiffs 37 years of age,have not ever heard of a police officer admit when he/she has done something wrong,even if its on video.Police will always deny,hiding behind their badge and always weaseling out of misconduct like police are not human. The defendants attornies are also attempting to deceive the plaintiff with word manipulation,and twisting the truth for their benefit,and are deceiving the court presenting distorded evidence in their(defendants) exhibit-A.

<u>SUPPLEMENT TO PLAINTIFFS</u>
<u>EXHIBIT#3</u>

Defendant further moves for a hearing to identify the various identification procedures used pursuant to Mass.R.Crim.P. 14(a)(1)(c), 14 (a)(2) and <u>Commonwealth v. Dougan</u>, 377 Mass. 303, 386 (N.E.2d 1, 1979.

As partial grounds for this request, counsel states identification is one of the most shaky basis of prosecution as established by case law, Comm. V. Dougan, Supra, and other cases as well as a report by the U.S. Justice Department, "Eyewitness Evidence: A Guide for Law Enforcement" (October, 1999) which established the unreliability of such evidence.

In further support of request(s) in the Motion counsel would offer Superior Court Justice Agnes impassioned and complete review of the identification issues in a 2004 decision and memorandum, and a reference to the American Bar Associations concerned review of this issue from renowned identification expert, Steven Penrod as well as a report of the errors and dangers of eyewitness identification by the U.S. Justice Department.

I.   Justice Agnes Decision

*The problem of eyewitness identification.* "There is no question that the danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. Indeed, mistaken identification is believed widely to be the primary cause of erroneous convictions." *Commonwealth v. Johnson,* 420 Mass. 458, 465

(1995).). [FN1] *Accord, Commonwealth v. Jones,* 423 Mass. 99, 109 (1996)("Eyewitness identification of a person whom the witness had never seen before the crime or other incident presents a substantial risk of misidentification and increases the chance of a conviction of an innocent defendant."). *See also Commonwealth v. Francis,* 390 Mass. 89, 100 (1983)("One of the most troublesome problems in the administration of criminal justice is the possibility that eyewitness identification testimony is wrong, given by a witness who sincerely but wrongly believes in the accuracy of his or her identification."). Unlike evidence seized in violation of the rules governing searches and seizures, or at least some statements obtained in violation of the *Miranda* doctrine, mistaken identification evidence jeopardizes the ability of the factfinder to perform its role at trial and diminishes the value of the trial process. *Commonwealth v. Johnson, supra,* 420 Mass. at 470, *quoting People v. Adams,* 53 N.Y.2d 241, 250-251 (1981). The problem arises not only due to the methods used by the police to secure identification evidence, but is attributable in part to factors relating the characteristics of the eyewitness and the perpetrator. *See Commonwealth v. Zimmerman,* 441 Mass. ----, ---- (March 9, 2004)(Cordy, J. concurring)(Pointing out the risks involved in cross- racial identifications because "the evidence is now quite clear that people are better able to recognize faces of their own race or ethnic group than faces of another race or ethnic group." Quoting G.L. Wells, Eyewitness Testimony, 54 Ann. Rev. Psychol. 277, 280-281 (2003)).

> FN1. In *Commonwealth v. Johnson, supra,* the Supreme Judicial Court explained that the concern about the risks associated with mistaken eyewitness identification procedures are not based on merely theoretical grounds. "[S]tudies conducted by psychologists and legal researchers since Brathwaite [*Manson v. Braithwaite,* 432 U.S. 98 (1977) ] have confirmed that eyewitness testimony is often hopelessly unreliable." *See also United States v. Wade,* 388 U.S. 218, 228 (1967)("[T]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); *Commonwealth v. Marini,* 375 Mass. 510, 519 (1978)("The law has not taken the position that a jury can be relied on to discount the value of an identification by a proper appraisal of the unsatisfactory circumstances in which it may have been made."). *See generally* Steven Penrod, "*Eyewitness Identification Evidence: How Well Are Witnesses and Police Performing,?* " 18 Criminal Justice 36 (No. 1, 2003)(American Bar Association)(analyzing studies about the accuracy of eyewitness identification evidence). *Commonwealth v. Johnson, supra* 420 Mass. at 467.

Com. v. Berry 2004 WL 745140, *3 (Mass.Super.) (Mass.Super.,2004)

*Proposals to address the problem of unnecessarily suggestive identification procedures.* The attention that eyewitness identification procedures have received in recent years in court decisions and academic writings, as well as in the popular press, led the United States Department of Justice to undertake a comprehensive review of the well documented problems, and to propose a systematic reform. In 1998, then Attorney General Janet Reno, called for the development of national guidelines for the collection of eyewitness evidence. A panel was formed under the auspices of the National Institute

of Justice. Eventually a Working Group was established that included researchers in the field of eyewitness identification procedure, fourteen law enforcement persons (from thirteen different states), four prosecutors, and three defense lawyers. This group produced a consensus document that was approved by Attorney General Reno and published by the United States Department of Justice in October, 1999. The 55 page report is entitled *Eyewitness Evidence: A Guide for Law Enforcement.("Guide")*. [FN4] The report is accompanied by a Message from the Attorney General in which she stated that "in developing its eyewitness evidence procedures, every jurisdiction should give careful consideration to the recommendations in this Guide and to its own unique local conditions and logistical circumstances. Although factors that vary among investigations, including the nature and quality of other evidence and whether a witness is also a victim of the crime, may call for different approaches or even preclude the use of certain procedures described in the Guide, consideration of the Guide's recommendations may be invaluable to a jurisdiction shaping its own protocols. As such, *Eyewitness Evidence: A Guide for Law Enforcement* is an important tool for refining investigative practices dealing with this evidence as we continue our search for truth." *Guide,* at iii-iv (NIJ, Oct. 1999).

> FN4. The full report is available on the World Wide Web at http:// www.ncjrs.org/txtfiles1/nij/178261.txt.

*5 The *Guide* is not in the form of a procedural rule that purports to define every circumstance in which a one-on-one identification procedure is or is not justified. Instead, it is a guideline which suggests an approach to identification procedures that avoids suggestive police practices. [FN5] The Guide is not only suitable for use as instructional material in recruit and in service police training programs throughout the Commonwealth, but also should be considered by the police agencies and departments in the development of policy standards. [FN6]

> FN5. A copy of Section V of the Guide dealing with live and photographic lineups and arrays is contained in Appendix A. Other research suggests that the Guide does not go far enough. "[T]he primary role played by eyewitness confidence in the legal system's assessment of the credibility of the identification, in conjunction with the clear empirical evidence of confidence malleability, demands that confidence statements be obtained at the time of the identification (before other variables begin to exert their influence on the eyewitness)." See Wells et al., *"Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads,* " 22 Law and Human Behavior 1, 33 (1998).

> FN6. Legislation proposing statutory guidelines to govern pretrial identification procedures by the police, consistent with the 1998 Justice Department Guide, has been filed in this session of the Massachusetts

legislature on the House side by Representatives O'Flaherty, Fallon and Candaras, House Bill No. 748, and on the Senate side by Senators Creem and Creedon. Senate Bill No. 173. It appears that at least one state, New Jersey, has adopted the recommendations contained in the Guide. See Steven Penrod, *"Eyewitness Identification Evidence: How Well Are Witnesses and Police Performing,?"* 18 Criminal Justice 36, 54 (No. 1, 2003); *Comment, Mistaken Identifications Cause Wrongful Convictions,* 43 Santa Clara L.Rev. 213 (2002).

Among other things, the Guide outlines an approach to obtaining information from witnesses at the scene, an approach to compiling a live or photographic lineup or array, and an approach to conducting the identification procedure.
In particular, the Guide suggests that "(p)rior to presenting a lineup [or an array], the investigator shall provide instructions to the witness to ensure the witness understands that the purpose of the identification procedure is to exculpate the innocent as well as to identify the actual perpetrator." Guide at 31. In particular, before presenting a photo array, the Guide suggests that witnesses should be told it is just as important to clear the innocent as to identify the guilty party; that persons depicted in the array may not look exactly as they did at the time of the offense; that the person or persons who committed the crime may or may not be in the lineup; that whether or nor an identification is made the police will continue with the investigation; that the procedures employed by the police require the investigator to ask the witness to state, in his or her own words, how certain the viewer is of his or her identification. Guide Section V at 31-32.
The Guide also contains a recommendation about how police should compile photographic arrays. It suggests that only one suspect should be included in each identification procedure along with at least 4 non-suspect fillers. These fillers "should generally fit the witness's description of the perpetrator," or, absent such a description or when the description doesn't match the suspect, the description of the suspect. The Guide further states that "complete uniformity" is not required, but recommends against using fillers who so closely resemble the suspect that even people who know the suspect might have difficulty in picking him or her out. The Guide suggests that the person compiling the array should "[c]reate a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature." The police should avoid using the same fillers in arrays shown to the same witness. Guide, Section V at 29.

Com. v. Berry L 745140, *4 -5 (Mass.Super.,2004)

II. American Bar Association

As of January 2003, the Cardozo Law School Innocence Project's website reported that 123 individuals who had been convicted of crimes had subsequently been exonerated because of DNA testing. (See www.innocenceproject.org.) Of the first 82 exonerations, 60 of them--or nearly 75 percent--involved mistaken eyewitness identification. This will surprise no one familiar with the research on erroneous convictions generally or on

eyewitness reliability more specifically.

18-SPG Crim. Just. 36, *37 Article by Steven Penrod, appearing in ABA's Criminal Justice publication in Spring, 2003, "Eyewitness Identification Evidence: How are Witnesses and Police Performing?"

The Defendant states that the material requested is essential to the full preparation of a defense as guaranteed by the Sixth Amendment to the United States Constitution and by Article XII of the Declaration of Rights to the Constitution of the Commonwealth of Massachusetts.

## CLOSING

14) Ultimately, the defense is displaying the same conduct that the Holyoke Police officers are guilty of.

The plaintiff objects and opposes their motion and every other feeble excuse that defense attornies can dream up for their unprofessional officers.

## RELIEF SOUGHT

Plaintiff wishes to sue each defendant in their individual capacity as well as their official capacity. The plaintiff wishes to be compansated for misconduct by police against the plaintiff, in the monetary sum of one million dollars of American currency(1,000,000).

## DAMAGES

Plaintiff has suffered; false arrest, malicious prosecution, wrongful incarceration, <u>racial slurs, epithets, threats(by officer Donze)</u>,. As a result of plaintiffs false arrest and wrongful conviction, plaintiff also suffers mental anguish, mental stess, anxiety, depression, loss of life liberty, property, denied due process of law, denied equal protection of laws, due to police not conducting photo array or line which would have been proper procedure in an identification case such as this case.

Wherefore, plaintiff seeks damages against defendants for misconduct and any other relief this Honorable Court may deem just and proper.

        Respectfully submitted

        Pro se plaintiff,

        David Ribeiro #w85454
        M.C.I. Norfolk
        p.o box 43
        Norfolk ma, 02056
        sign _David Ribeiro_

        date - October 24, 2005

## certificate of service

I, David Ribeiro, pro se plaintiff certifies that on the above date, mailed copies of enclosed motion in response to defendants motion for summary judgement, via U.S mail service to the attornies of the defendants, and the clerk of The U.S District Court.

JOHN VIGLIOTTI, ESQ
AUSTIN JOYCE, ESQ
397 GROVE ST.
WORCESTER MA, 01605

CHARLES . LAVELLE, ESQ
HOLYOKE LAW DEPT.
20 KOREAN VETERANS
PLAZA HOLYOKE MA, 01040

CLERK OF COURT
U.S. DISTRICT COURT
1550 MAIN ST. RM. 512
SPRGFLD MA, 01103